UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X  ONLINE PUBLICATION ONLY
ELI BENSINGER, Individually and on Behalf of All
Others Similarly Situated,

       Plaintiff,                                    MEMORANDUM AND ORDER

  -against-                                    10-CV-1917 (JG)

DENBURY RESOURCES INC.,

       Defendant.
----------------------------------------------------------------X

A P P E A R A N C E S:

    JOSEPH H. WEISS, ESQ.
        1500 Broadway
        New York, New York 10036
    By:    Joseph H. Weiss
        David Katz
        *Attorney for Plaintiff*

    BAKER & HOSTETLER, LLP
        45 Rockefeller Plaza
        New York, New York 10111
    By:    Mark Kornfeld
        Kathryn M. Hein
        Melissa Lori Kosack
        *Attorneys for Defendant*

JOHN GLEESON, United States District Judge:

        Eli Bensinger, individually and on behalf of all others similarly situated, ("Bensinger" or "plaintiff") alleges in his Amended Complaint (the "complaint") that defendant Denbury Resources Inc. ("Denbury" or "defendant") is liable under Section 11 of the Securities Act of 1933 and Section 14 of the Securities Exchange Act of 1934 for material

misrepresentations in connection with Denbury's acquisition (the "merger") of Encore Acquisition Company ("Encore"). Bensinger was an Encore shareholder. (Compl. ¶ 4.)

The heart of Bensinger's claim is that Encore shareholders were falsely informed on multiple occasions that the formula for calculating the number of Denbury shares to be distributed to Encore shareholders as consideration for the merger was pegged to a weighted average share price of Denbury stock as of the date two days prior to the closing of the merger, which turned out to be Friday, March 5, 2010. In fact, the merger agreement pegged the calculation to the date of the second full trading day prior to the "effective time" of the merger, which, as that term was defined, turned out to be Monday, March 8, 2010. By using the March 8 date instead of March 5, Denbury paid less to the Encore shareholders, which resulted in this lawsuit.

Denbury now moves to dismiss the complaint, contending that: (1) it was brought in violation of a forum selection clause to which Bensinger is subject; (2) it is barred under the doctrines of res judicata and collateral estoppel; and (3) it fails to state a claim upon which relief may be granted. For the reasons set forth below, Denbury's motion is denied.

BACKGROUND

A.  *The Facts*[1]

On October 31, 2009, Denbury and Encore entered into an agreement pursuant to which, following stockholder approval and satisfaction of other conditions, Encore would merge into Denbury. (Compl. ¶ 13; Heim Dec., Ex. C, Annex A (the "Agreement") §

---

[1] The facts are drawn largely from the plaintiff's complaint and for the purpose of this motion are assumed to be true.

1.2.[2]) Section 2.1 of the Agreement provided a formula for determining the number of shares of Denbury common stock to be delivered upon the closing of the merger, stating that the Denbury share value was based on the "volume weighted average price of [Denbury] common stock for the period of twenty (20) consecutive trading days ending on the *second full trading day prior to the Effective Time*." (Agreement § 2.1 (emphasis added).) "Effective Time" is defined in the Agreement as "the date and time of filing of the Certificate of Merger with the Secretary of State." (Compl. ¶ 20; *see* Agreement § 1.2.)

The Agreement also contains a provision establishing Delaware as the forum for any litigation between the parties in connection with the merger:

> All actions and proceedings arising out of or relating to this Agreement shall be heard and determined by the Delaware Court of Chancery or a federal district court located in Delaware. Each of [Encore] and [Denbury] hereby irrevocably and unconditionally consents to the exclusive jurisdiction of the Delaware Court of Chancery or a federal district court located in Delaware for any litigation arising out of or relating to this Agreement and the transactions contemplated hereby (and agrees not to commence any litigation thereto except in such court) . . . .

(Agreement § 9.9.) The Agreement further identifies the rights of shareholders and others in connection with the Agreement under § 9.7 of the Agreement, entitled "Parties in Interest," which references the plaintiff's right to enforce payment of the merger consideration under the Agreement:

> This Agreement shall be binding upon and inure solely to the benefit of each party hereto, and nothing in this Agreement, express or implied, is intended to or shall confer upon any other person any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement, other than Sections 2.1 (from and after the Effective Time), 6.4 and 6.9 (which are intended to be for the benefit of the persons covered thereby and may be enforced by such persons) and except for (i) the rights of

---

[2] The Agreement begins on page 276 of Docket No. 26-6.

3

> holders of [Encore] Common Stock to enforce their rights to receive the Merger Consideration in accordance with Article II upon consummation of the merger in the event the Merger is consummated and (ii) the rights of the Financing Sources to enforce their rights under Section 8.3(c)(iii) and Section 9.9.

(Agreement § 9.7.)

On the following day, November 1, 2009, Denbury and Encore announced that Denbury was to acquire Encore in exchange for stock and cash. (Compl. ¶ 13.) The joint press release provided the following description of the calculation of the merger consideration under the "Terms of the Transaction":

> The final number of Denbury shares to be issued will be adjusted based on the volume weighted average price of Denbury common stock for a 20 day trading period ending on the *second day prior to closing*.

(Compl. ¶ 14 (emphasis in original).) In public statements and filings in the next four months leading up to the shareholder vote, Denbury continued to describe the consideration as being determined "based on the volume weighted average price of Denbury common stock for a 20 day trading period ending on the *second day prior to closing*." (Compl. ¶¶ 15-17 (emphasis in original).)[3] Additionally, both the registration statement for the merger and the Pre-Effective Amendment No. 1 to that registration statement stated: "The final number of Denbury shares to be issued will be adjusted based on the volume-weighted average price of Denbury common stock on the NYSE for the twenty-day trading period ending on the second day prior to closing." (Compl. ¶¶ 18, 19.) On the other hand, on the cover page to the registration statement and in the "Questions and Answers about the Merger" section, and, of course, in the Agreement itself,

---

[3] Denbury Form 8-K, under the heading "Exchange Ratio," October 31, 2009 (Compl. ¶ 15); Encore Form 8-K under the heading "Entry into a Material Definitive Agreement," October 31, 2009 (Compl. ¶ 16); Denbury Form 10-Q, dated November 9, 2009, for the quarter ended September 30, 2009 (Compl. ¶ 17).

which was annexed to the registration statement, it was stated that the merger consideration would be calculated based "on the period of twenty (20) consecutive trading days ending the second full trading day prior to the effective time of the merger . . . ." (Heim Dec., Ex. H (the "Registration Statement") at 4, 19, 264, 387.)

On February 1, 2010, Denbury and Encore announced that they had scheduled their respective shareholder meetings to vote on the merger for March 9, 2010. (Compl. ¶ 22.) One month prior to those meetings, on February 8, 2010, Denbury and Encore filed a proxy statement with the SEC, which was thereafter disseminated to their respective shareholders, soliciting approval of the merger by the majority of each company's shareholders. (Compl. ¶ 23.) The cover page stated:

> The actual number of shares of Denbury common stock to be issued to Encore stockholders receiving either all stock or a mix of cash and stock consideration will be determined under a collar mechanism based upon the volume weighted average price of Denbury common stock for the *20-day trading period ending on the second full trading day prior to the effective time of the merger*, as more fully described in this joint proxy statement/prospectus.

(Compl. ¶ 23; Heim Dec., Ex. C (the "Proxy Statement") at 2 (emphasis added).) The Proxy Statement also contained a section entitled "Effective Time; Closing" which stated:

> The merger will become effective on the date a certificate of merger is filed with the Delaware Secretary of State. The [Agreement] provides that the certificate of merger is to be filed as promptly as practicable after all the conditions to the closing of the merger are satisfied or waived.

(Compl. ¶ 24; Proxy Statement at 93.) The Notes to Financial Information in the proxy stated that "[t]he final number of Denbury shares to be issued will be adjusted based on the volume-weighted average price of Denbury common stock on the NYSE for the twenty-day trading period ending on the *second day prior to closing*." (Compl. ¶ 25 (emphasis in original).) The

5

Agreement, the November 1 joint press release, the Denbury Form 8-K, the Denbury 10-Q, the Registration Statement, and the Pre-Effective Amendment No. 1 to the Registration Statement were all expressly incorporated by reference into the Proxy Statement. (*See* Compl. ¶ 20.)

The merger closed and became effective on Tuesday, March 9, 2010, after Denbury and Encore shareholders voted in its favor at their respective shareholders' meetings and the filing of the certificate of merger on that date with the Delaware Secretary of State. (Compl. ¶ 27.) In a Form 8-K filed with the SEC on March 12, 2010, Denbury represented that the merger was consummated on March 9, in the evening, upon filing the Certificate of Merger with the Delaware Secretary of State. Because the effective time of the merger was after the markets closed on March 9, March 9 itself was considered a full trading day prior to the effective time, and Denbury designated March 8 as the second full trading day prior to the effective time. (Compl. ¶¶ 28, 32.) Denbury further represented that it issued approximately 134.4 million shares of its common stock and paid approximately $829.4 million in cash to Encore shareholders. (Compl. ¶ 28.) The shareholder elective groups received the following compensation per share of Encore stock: (1) all-cash electing Encore shareholders received $46.48 in cash and 0.2417 shares of Denbury stock; (2) all-stock electing Encore shareholders (and those whose Encore restricted stock bonuses converted into Denbury restricted stock) received 3.4354 shares of Denbury common stock; and (3) mixed cash/stock electing (or non-electing) Encore stockholders received $15 in cash and 2.4048 shares of Denbury common stock. (Compl. ¶ 29.) Denbury based the calculation on the average price for the twenty-day period ending on March 8, 2010. (Compl. ¶ 32.)

Plaintiffs contend that the second full trading day prior to the Tuesday, March 9 closing was not March 8, but Friday, March 5. (Compl. ¶ 30.) By employing the March 8 date rather than the March 5 date, Encore shareholders received about 800,000 fewer Denbury shares. (Compl. ¶ 32.)[4]

B.  *The Procedural History*

The initial complaint in this case was filed on April 28, 2010. (Docket No. 1.) On June 18, 2010 the case was stayed until after the final resolution of an earlier-filed action pending in the Court of Chancery in the State of Delaware, *The Merger Fund, et al. v. Denbury Resources Inc., et al.*, No. 5354-CC ("the Delaware action"). (*See* Docket No. 15 (Order of Judge David Trager).) The Delaware action, filed by several former Encore shareholders on March 19, 2010, challenged Denbury's calculation of the merger consideration based on the language used in the Agreement. (Heim Decl. Ex. E ("Delaware complaint").) The Delaware complaint asserted three state law claims: breach of contract; breach of the duty of good faith and fair dealing; and breach of fiduciary duty. (*Id.* ¶¶ 31-42.) On December 14, 2010, the Delaware action was dismissed with prejudice. (Heim Decl. Ex. D.) In granting the motion to dismiss, Chancellor William B. Chandler found that the calculation used by defendants was supported by the plain language of the Agreement. (*Id.* at 4-5.) Chancellor Chandler did not address any federal securities law claims in his decision. (*Id.* at 4-13.)

The stay in this litigation was lifted on February 7, 2011, and on March 15, 2011, Denbury filed a motion to dismiss this case based on (1) enforcement of a forum selection

---

[4] If the exchange ratio had been calculated based on the March 5 date, Encore shareholders would have received the following consideration: (1) all-cash electing shareholders would have received 0.2433 Denbury shares (rather than the 0.2417 shares they actually received); (2) all-stock electing shareholders would have

7

clause, (2) res judicata and/or collateral estoppel; and (3) a failure to state a valid claim under federal securities law.

## DISCUSSION

A.  *The Legal Standard*

In evaluating a motion to dismiss pursuant to Rule 12(b)(6), a court accepts the truth of the facts alleged in the complaint and draws all reasonable inferences in the plaintiff's favor. *Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir. 2007). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 1950.

On a motion to dismiss, "'the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.'" *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. Co.*, 62 F.3d 69, 72 (2002)). Further, in securities fraud actions, the court may consider documents filed with the SEC. *In re N.Y. Cmty. Bancorp Inc. Sec. Lit.*, 448 F. Supp. 2d 466, 476-77 (E.D.N.Y. 2006) (citing *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000)).

---

received 3.4567 Denbury shares (rather than 3.4354); and (3) mixed cash/stock electing (or non-electing)

B.  *The Applicability of the Forum Selection Clause*

Because Bensinger and other similarly-situated shareholders were not parties to the Agreement between Encore and Denbury, and are not otherwise bound by the forum selection clause, this provision is unenforceable against Bensinger. In order to dismiss the present action based on the forum selection clause in the Agreement, a determination must be made as to whether (1) the clause was reasonably communicated to plaintiff; (2) it is mandatory or permissive; and (3) the claims and parties involved in the action are subject to the forum selection clause. *Phillips v. Audio Active. Ltd.*, 494 F.3d 378, 383 (2d Cir. 2007).

Where it can be shown that both the plaintiff and the plaintiff's claims are subject to a mandatory forum selection clause, and that the clause was reasonably communicated to the plaintiff, such a clause is presumptively enforceable. *Id.* Where a clause is presumptively enforceable, a party may rebut that presumption by making a showing that "enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching." *Id.* at 383-84 (quoting *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972)). Denbury asserts that the forum selection clause in the Agreement meets the standard set forth above and that dismissal is warranted.

Bensinger disputes the third prong of the inquiry described above, arguing that the forum selection clause does not apply to him or his claims. I agree that the clause does not apply to him. Bensinger is not a party to the Agreement and, in fact, is excluded from the forum selection clause according to its plain language. The Agreement is between Denbury and Encore. The specific language of the forum selection clause in § 9.9 of the Agreement does not

---

shareholders would have received 2.4197 Denbury shares (rather than 2.4048). (Compl. ¶ 31.)

9

mention any other parties, stating only that "[e]ach of [Encore] and [Denbury] hereby irrevocably and unconditionally consents" to the terms of the clause.[5]

While non-parties in some cases may be bound by a forum selection clause, *see Novak v. Tucows, Inc.*, 2007 WL 922306, at *13 n.11 (E.D.N.Y. Mar. 26, 2007) (third-party beneficiary was bound by clause), here Bensinger is excluded under the terms of the Agreement and the forum selection clause therein is therefore inapplicable. The rights of shareholders in connection with the Agreement are identified under § 9.7 of the Agreement, entitled "Parties in Interest," which references the plaintiff's right to enforce payment of the merger consideration under the Agreement:

> This Agreement shall be binding upon and inure solely to the benefit of each party hereto, and nothing in this Agreement, express or implied, is intended to or shall confer upon any other person any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement, other than Sections 2.1 (from and after the Effective Time), 6.4 and 6.9 (which are intended to be for the benefit of the persons covered thereby and may be enforced by such persons) and except for (i) the rights of holders of [Encore] Common Stock to enforce their rights to receive the Merger Consideration in accordance with Article II upon consummation of the merger in the event the Merger is consummated and (ii) the rights of the Financing Sources to enforce their rights under Section 8.3(c)(iii) and Section 9.9.

---

[5] Non-parties in some cases may be bound by a forum selection clause, but "the party must be closely related to the dispute such that it becomes foreseeable that it will be bound." *Nanopierce Tech., Inc. v. Southridge Capital Mgmt. LLC*, 2003 WL 22882137, at *5 (S.D.N.Y. Dec. 4, 2005) (quotation marks and citations omitted). Denbury argues that Bensinger is a third-party beneficiary under the Agreement because shareholders have rights to enforce the agreed-upon merger consideration under the terms of the Agreement. Denbury further argues that third-party beneficiaries of a contract by definition satisfy the "closely related" and "foreseeab[ility]" requirements. *Id.*; *see Universal Grading Serv. v. eBay, Inc.*, 2009 WL 2029796, at *15-17 (E.D.N.Y. June 10, 2009). This argument would be persuasive if Bensinger were seeking to enforce rights to the merger consideration under § 9.7, however, he seeks damages for the allegedly false and misleading statements made in the proxy statement, not to enforce any provision of the Agreement. As such, for purposes of this action, Bensinger cannot be considered a third-party beneficiary of the Agreement.

The Agreement thus clearly states that no rights are conferred to non-parties generally, or shareholders specifically, other than shareholders' rights to enforce the merger consideration promised in the Agreement.

This action does not seek to enforce the merger consideration promised in the Agreement; rather, it seeks damages because that consideration was less than what was represented in the Registration and Proxy Statements.[6] Since the clause has no application here, plaintiff's choice of forum must be given substantial weight and "should not be disturbed unless the balance of convenience and justice weighs heavily in favor of defendants' proposed forum." *Micromuse, Inc. v. Aprisma Mgmt. Tech., Inc.*, 2005 WL 1241924, at *3 (S.D.N.Y. May 24, 2005). Defendants have made no such showing here.

C.   *Res Judicata and Collateral Estoppel*

Where there is a final state court judgment, a federal court will look to that state's rules of res judicata and collateral estoppels to determine the preclusive effect of the judgment. *AmBase Corp. v. City Investing Co. Liquidating Trust*, 326 F.3d 63, 72 (2d Cir. 2003). Delaware, like New York, applies a "common nucleus of operative facts" analysis when applying the doctrine of res judicata. *Id.* at 73. "In other words, 'if the pleadings framing the issues in the first action would have permitted the raising of the issue sought to be raised in the second action . . .' then the claims in the second action are precluded." *Id.* (quoting *Ezzes v. Ackerman*, 234 A.2d 444, 445-46 (Del. 1967)). Thus, res judicata only encompasses claims "that were litigated or which *could have been litigated* in the earlier proceeding." *Aveta Inc. v. Bengoa*, 986 A.2d 1166, 1185 (Del. Ch. 2009) (emphasis in original).

Under Delaware law, "a claim is barred by res judicata if: (1) the court that adjudicated the prior action had jurisdiction to do so; (2) the parties to the subsequent action are the same as (or privies to those in) those in the prior action; (3) the causes of action in both cases are the same or the subsequent action arises from the same transaction that formed the basis of the prior action; (4) the merits in the prior action were decided adversely to contentions of the plaintiff; and (5) the prior action was final." *AmBase*, 326 F.3d at 72. The required elements for collateral estoppel are: "(1) the issue previously decided is identical to the present issue; (2) the issue was fully adjudicated on the merits; (3) the parties against whom the doctrine is invoked . . . were parties to the litigation or in privity with a party to the prior litigation; and (4) the parties against whom the doctrine is raised had a full and fair opportunity to litigate the issue." *Adv. Litig., LLC v. Jerzka*, 2006 Del. Ch. LEXIS 148, at *26 (Del. Ch. Aug. 10, 2006) (citing *Columbia Cas. Co. v. Playtex F.P., Inc.*, 584 A.2d 1214, 1216 (Del. 1991)).

Due to both a lack of privity between Bensinger and the plaintiffs in the Delaware action and the inability of the Delaware court to assert jurisdiction over federal securities claims, the doctrines of res judicata and collateral estoppel do not bar Bensinger's claims in the instant action. For a judgment to have either res judicata or collateral estoppel effect, some form of privity is required. Here, there is no relationship between Bensinger and the plaintiffs in the Delaware action other than their common status as Encore shareholders. No class was certified in the Delaware action; there was no appointment of a class representative or notice to the class;

---

[6] Bensinger's goal in bringing this lawsuit was made clear at oral argument. *See* Tr. Apr. 8, 2011, at 24-25.

12

the respective parties have not collectively litigated any issue regarding Denbury generally or the merger; and each is represented by different counsel.[7]

Even if Bensinger were a party to the Delaware action, he could still assert the federal securities law claims in this case. He could not have raised those claims in the Delaware action, and, as such, he did not have an opportunity to litigate them. Federal courts maintain exclusive jurisdiction over federal securities law violations under 15 U.S.C. § 78aa. *In re WorldCom Sec. Litig.*, 496 F.3d 245, 248 (2d Cir. 2007). Given that the claims raised by Bensinger in the instant action were not and could not have been addressed in the Delaware Court of Chancery, any final decision by that court can have no preclusive effect under either the doctrines of res judicata or of collateral estoppel in this case.[8]

---

[7] The Supreme Court expressly requires that procedural safeguards be employed in class action suits prior to giving preclusive effect to such judgments:

> If the forum state wishes to bind an absent plaintiff concerning a claim for money damages or similar relief at law, it must provide minimal procedural due process protection. The plaintiff must receive notice plus an opportunity to be heard and participate in the litigation, whether in person or through counsel. The notice must be the best practicable, reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. . . . The notice should describe the action and the plaintiffs' rights in it. Additionally, we hold that due process requires at a minimum that an absent plaintiff be provided with an opportunity to remove himself from the class by executing and returning an "opt out" or "request for exclusion" form to the court. Finally, the Due Process Clause of course requires that the named plaintiff at all times adequately represent the interests of the absent class members.

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12 (1985) (internal quotation marks and citations omitted).

[8] Bensinger also asserts that the claims in this action are fundamentally different from those in the Delaware action despite the fact that both claims arise from the same alleged defect in the calculation of merger consideration. The present action challenges alleged misrepresentations in the Proxy Statement by which Encore shareholders' votes in favor of the merger were solicited, whereas the Delaware action was an action for breach of contract and fiduciary duty on the Agreement itself. While the issues are clearly not identical, whether they arise from a "common nucleus of operative facts" under Delaware law does not affect the plaintiff's ability to assert his claims in the instant action because his claims could not have been raised in state court and plaintiff was not in privity with plaintiffs in the Delaware Action.

13

D.  *The Securities Law Claims*

Denbury misstated the merger calculation in both the Proxy and Registration Statements, and those misstatements are directly related to shareholder compensation. Thus, viewing the complaint in the light most favorable to Bensinger, he has stated a claim upon which relief may be granted. Bensinger alleges that the Proxy and Registration Statements were materially misleading in violation of Section 11 of the Securities Act of 1933 and Section 14 of the Securities Exchange Act of 1934. Section 11 imposes liability for registration statements that, upon becoming effective, contain "an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading." *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715 (2d Cir. 2011) (citing 15 U.S.C. § 77k(a)). Section 14(a) and Rule 14a-9 prohibit the promulgation of proxy statements

> containing any statement which is false or misleading with respect to any material fact, or which omit[] to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

*Oakland County Empl'ees' Ret. Sys. v. Massaro*, 702 F. Supp. 2d 1012, 1017 (N.D. Ill. Apr. 7, 2010).

In multiple instances, the Proxy and Registration Statements state that the merger consideration would be calculated based on the volume-weighted average price of Denbury stock for the 20-day trading period "ending on the second day prior to closing," rather than on the "second *full* trading day prior to the *effective time*" of the merger, as stated in the Agreement, the cover of the Proxy and Registration Statements, and elsewhere. (Compl. ¶¶ 14-19, 23, 25, 26.) He further argues that even though the Proxy Statement includes on its cover a statement of the

14

formula for merger consideration nearly identical to the Agreement, it is nonetheless materially misleading because it conflates the "Effective Time" with the "closing" on page 93 under the heading "Effective Time; Closing." (Opp. at 9-10; Proxy Statement at 93.) That section states that "[t]he merger will become effective on the date a certificate of merger is filed with the Delaware Secretary of State," whereas the Agreement defines the effective time as the "date *and time* of such filing." (Agreement § 1.2 (emphasis added).)

While the Section 11 and Section 14 claims have slightly different elements, they share the requirements that to be actionable (i) there actually must be a misstatement or omission at the time the statement is made and (ii) the misstatement or omission must be materially misleading. *In re N.Y. Cmty. Bancorp Inc. Sec. Litig.*, 448 F. Supp. 2d at 477-78.

1. *Misstatement or Omission*

Here, while the Agreement, Proxy Statement and Registration Statement each contain the correct formulation of the merger consideration, the fact remains that Denbury misstated in several instances the precise formula that would be used to calculate the merger consideration. Denbury argues that at the time the alleged misstatements were made, the exact date of the merger, the process for satisfying the conditions to close the merger, the time of day when the Certificate of Merger would be filed, and the market price of Denbury shares were all preliminary and speculative. It contends that Bensinger's allegations are therefore "fraud-by-hindsight." *See New Jersey Carpenters Vacation Fund v. Royal Bank of Scotland Grp., plc*, 720 F. Supp. 2d 254, 271 (S.D.N.Y. 2010). While it is true that "[t]he truth of a statement made in the prospectus is adjudged by the facts as they existed when the registration statement became effective," *id.* (citation omitted), the circumstances surrounding the offering do not change the

15

fact the calculation of the merger consideration, in several instances, was stated inaccurately. In fact, the merger consideration would not be (and was not) based on a formula pegged to two days prior to the August 9 closing. The multiple statements by Denbury to the contrary were false.

2.  *Materiality*

The misstatements at issue here are not immaterial as a matter of law. They relate directly to the consideration to be received by Encore shareholders. Under Section 11, the test for whether an alleged misstatement or omission is material is whether there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (quoting *TSC Indus. Inc. v. Northway Inc.*, 426 U.S. 438, 449 (1976)) (Section 10(b) claims); *see In re N.Y. Cmty. Bancorp Inc. Sec. Litig.*, 448 F. Supp. 2d at 478 (applying *Basic Inc.* materiality standard to Section 11 claims). In the context of a proxy statement, the materiality standard under Section 14(a) and Rule 14a-9 turns on "whether 'a reasonable shareholder would consider [the fact] important in deciding how to vote.'" *In re N.Y. Cmty. Bancorp Inc. Sec. Litig.*, 448 F. Supp. 2d at 478 (quoting *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1090 (1991)); *see Resnik v. Swartz*, 303 F.3d 147, 151 (2d Cir. 2002).

Materiality is an "inherently fact-specific finding." *Litwin*, 634 F.3d 706, 716 (quoting *Basic Inc.*, 485 U.S. at 236). "'[A] complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000) (quoting

16

*Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985)). Even at the summary judgment stage, the "determination [of materiality] requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact." *TSC Indus., Inc.*, 426 U.S. at 450.

Here, defendants indisputably misstated the method of calculating the merger consideration in the Proxy and Registration Statements.[9] Had the merger consideration been computed in the manner described by Denbury's false statements, Encore shareholders would have received significantly greater consideration for their shares. Because the alleged misstatements relate directly to the compensation shareholders were entitled to receive in the merger, it cannot be said as a matter of law that those misstatements could not have significantly altered the total mix of information available to a reasonable investor. As such, this court cannot conclude that Denbury's misstatements are immaterial as a matter of law.

---

[9] Defendants argue that the text of both the December 7, 2009 Registration Statement and the February 8, 2010 Proxy Statement both clearly disclose that the methodology for calculating merger consideration will be "based upon the volume weighted average price of Denbury common stock for the 20-day trading period ending on the second full trading day prior to the effective time of the merger . . ." (*see* Registration Statement at 4, 19, 264, 387; Proxy Statement at 2, 17, 286, 416), and that in light of those disclosures, the misstatements are immaterial. Aside from refuting the accuracy of those statements in light of the definition of "effective time" and "closing" in the Proxy or Registration Statements, Bensinger also points to multiple misstatements in the Proxy and Registration Statements. (Opp. at 9.) Viewing the evidence in the light most favorable to Bensinger, it cannot be said as a matter of law that the misstatements in the Proxy and Registration statement are immaterial. Plaintiffs are not responsible for parsing out conflicting statements where proxy and registration statements are inconsistent. *See SEC v. Bank of Am. Corp.*, 653 F. Supp. 2d 507, 509 (S.D.N.Y. 2009) ("[S]hareholders are entitled to rely on the representations in the proxy itself, and are not required to puzzle out material information from a variety of external sources.").

CONCLUSION

For the foregoing reasons, the defendant's motion to dismiss is denied.

So ordered.

JOHN GLEESON, U.S.D.J.

Dated: August 17, 2011
Brooklyn, New York